21-813-cv
Lawrence v. Hearst Commc'ns, Inc.

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 28th day of March, two thousand twenty-two.

PRESENT:
> DENNIS JACOBS,
> RICHARD C. WESLEY,
> STEVEN J. MENASHI,
> *Circuit Judges.*

_____

James Lawrence,

> *Plaintiff-Appellant*,

v.                                                                          21-813

Hearst Communications, Inc.,

> *Defendant-Appellee.*

_____

FOR PLAINTIFF-APPELLANT:                        James Lawrence, pro se, Westport, CT.

FOR DEFENDANT-APPELLEE:                        Jonathan R. Donnellan, Stephen Yuhan, Office of the General Counsel, The Hearst Corporation, New York, NY.

Appeal from a judgment of the United States District Court for the District of Connecticut (Shea, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED.**

In February 2020, James Lawrence, pro se, sued Hearst Communications, Inc. ("Hearst") for defamation based on its reporting of his March 2018 arrest for breach of the peace in Westport, Connecticut. The arrest arose from an incident on November 5, 2017, in which Lawrence followed a woman around a grocery store and out to her car. Lawrence alleged that one of Hearst's subsidiaries falsely used the words "harass" and "haunt" to describe his behavior in its online news articles about the incident and several comparable past incidents. The first article, published on March 12, 2018 ("Article 1"), does not contain the allegedly defamatory terms. The defamation is alleged as to a similar article published on March 23, 2018 ("Article 2"), and a third article, published on February 11, 2018 ("Article 3"), which described his arrest for second-degree harassment. He also alleged a claim for intentional infliction of emotional distress. Hearst subsequently moved to dismiss, arguing that the news reports were substantially true and that the emotional distress claim was derivative of the defamation claim. After treating the motion to dismiss as a motion for summary judgment—and providing an opportunity for both parties to submit evidence and supplemental briefs—the district court granted Hearst summary judgment on the ground that its reports were substantially true and not defamatory and that the emotional distress claim was derivative. Lawrence appeals. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

We review a grant of summary judgment *de novo*, "resolving all ambiguities and drawing all permissible inferences in favor of the nonmoving party." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 83 (2d Cir. 2020). "Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).

Defamation claims are "rooted in [Connecticut's] common law" but are "heavily influenced by the minimum standards required by the [F]irst [A]mendment." *Gleason v. Smolinski*, 319 Conn. 394, 430 (2015). To prevail on a defamation claim in Connecticut, a plaintiff must show that (1) the defendant published a defamatory statement that (2) identified the plaintiff to a third person, (3) was published to a third person, and (4) led to the plaintiff's reputation suffering an injury. *Id.* A statement is defamatory when it "tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* at 431. Of course, "for a claim of defamation to be actionable, the statement must be false." *Id.* Private plaintiffs have the burden of proving falsity against media defendants for speech of public concern. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986).

Media defendants do not incur liability for reporting that is "substantially true" even if it is not literally true. *Strada v. Conn. Newspapers, Inc.*, 193 Conn. 313, 321-23 (1984) (rejecting a "fussy insistence upon literal accuracy"); *see also Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516 (1991) ("The common law of libel ... overlooks minor inaccuracies and concentrates on substantial truth."). In determining substantial truth, the "issue is whether the libel, as published,

3

would have a different effect on the reader than the pleaded truth would have produced." *Goodrich v. Waterbury Republican-Am., Inc.*, 188 Conn. 107, 113 (1982). A defendant's statement is substantially true when "the main charge, or gist, of the libel is true" and, consequently, "minor errors that do not change a reader's perception of the statement do not make the statement actionable." *Strada*, 193 Conn. at 322 (internal quotation marks omitted). "Particular words or statements must be viewed, not in isolation, but in terms of the context of the entire communication." *Woodcock v. J. Publ'g Co., Inc.*, 230 Conn. 525, 554 (1994) (Berdon, J., concurring); *see Greenbelt Co-op. Publ'g. Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14 (1970) (assessing the term "blackmail" in context to gauge how a "reader ... understood exactly what was meant" when assessing libel claim of a plaintiff never criminally charged with blackmail).

Here, the district court properly granted summary judgment because the evidence showed that Hearst's reporting was substantially true.[1] The allegedly defamatory articles that Hearst published about Lawrence (the "Articles") properly communicated the "gist" of the Westport Police Department ("WPD") reports,[2] which was that multiple women had complained to the police about Lawrence's unwelcome behavior following them around stores and to their cars.[3] Although Lawrence alleges that Hearst falsely implied that he was charged and convicted of harassment as a result of the complaints, the Articles explicitly stated otherwise. Article 2 said that

---

[1] Hearst also argues that its reporting is protected by the fair report privilege. Because Hearst's reporting was substantially true, we need not decide whether the fair report privilege applies.

[2] The WPD reports included an affidavit accompanying the arrest warrant application for Lawrence's March 2018 arrest and an incident report for his February 2019 arrest.

[3] Hearst's use of the term "women" also was not libelous. Although only one woman was involved in the November 5th incident, the police report noted numerous complaints dating back to 2002.

Lawrence had "no criminal history in Connecticut," and Article 3 clarified that while "Lawrence was logged by Westport police in 10 incidents where women felt harassed by him ... in each case, they felt afraid to pursue charges," indicating that no conviction had occurred.

Lawrence contends that Hearst's use of the terms "harass" or "haunt" in the Articles was defamatory. While those specific words were not used in the WPD's arrest warrant application for the November 5, 2017 incident, that does not change the analysis. First, Connecticut defamation law focuses not on "particular words or statements ... in isolation" but requires examining "the context of the entire communication." *Woodcock*, 230 Conn. at 554. The overall depiction of Lawrence's conduct in the Articles was grounded in the complaints made against Lawrence for his pattern of behavior in following women around public places, which the WPD affidavit and incident reports showed to be substantially true. Second, none of the Articles reported that Lawrence was arrested for harassment for the November 5, 2017 incident,[4] and all explicitly reported that his arrest was for breach of the peace. The use of the term "harassment" therefore did not rise even to the level of the "minor inaccuracies" that the Supreme Court has deemed insufficient to establish defamation. *See Masson*, 501 U.S. at 516.

Third, Lawrence's behavior satisfies the commonly understood definition of "harassment." As we stated in *Lawrence v. Altice USA*, 841 F. App'x 273 (2d Cir. 2021) (summary order), Lawrence's first defamation lawsuit regarding media coverage of his March 2018 arrest,[5] "[a]

---

[4] Article 3 reported that Lawrence was arrested for second-degree harassment in February 2019, which Lawrence does not contest. However, he still argues that Article 3 is defamatory based on its description of his prior criminal history.

[5] In *Altice*, we affirmed the district court's grant of summary judgment in favor of Altice USA, reasoning that its coverage of Lawrence's March 2018 arrest and similar prior incidents was substantially true, his defamation claim failed, and his emotional distress claim also was meritless.

media defendant's characterization of criminal allegations against a private plaintiff is substantially true if the characterization comports with the common understanding of the terms employed." *Id.* at 276. The district court determined that Lawrence's behavior met the Merriam-Webster definition of harassment, including "to annoy persistently" and "to create an unpleasant or hostile situation ... especially by uninvited and unwelcome verbal or physical conduct." The WPD affidavit and incident reports described Lawrence's pattern of conduct as following women around, "star[ing] at them," and "get[ting] right into their personal space." As reported to the WPD, his behavior "scared the complainants to the point of them calling the police"; furthermore, his threatening behavior made them "fear[] for their safety" such that they refused to provide sworn statements against him. His behavior thus could be described with the dictionary definition of harassment.

Hearst's use of the word "haunt" similarly "comports with the common understanding of the terms employed." *Id.* As the district court noted, the term "fairly characterized" Lawrence's interaction with Wendy Chambers, a woman quoted in Article 2. Chambers stated that Lawrence "scared the crap out of me" and was "a creep," suggesting that his behavior had a "disquieting or harmful effect" on her. Even notwithstanding such a definition, the term "haunt" falls within the "leeway" granted to publishers who "recount and popularize" an event. *Strada*, 193 Conn. at 320; *see also id.* at 317 ("Facts do not cease to be facts because they are mixed with the fair and

---

*See Altice*, 841 F. App'x at 275, 277. *Altice* involved coverage of the November 5, 2017 incident, the March 2018 arrest, and the history of complaints against Lawrence, but not his February 2019 arrest. The *Altice* reporting also included use of the term "stalking" to describe Lawrence's behavior. Other than those two differences, the reporting—including both factual information and descriptive terms—that was before us in *Altice* is similar to Hearst's coverage. *Id.* at 274-75, 277.

6

expectant comment of the story teller, who adds to the recital a little touch by his piquant pen.")
(quoting *Briarcliff Lodge Hotel v. Citizen-Sentinel Publishers*, 260 N.Y. 106, 119 (1932)).
Hearst's use of the terms "harass" and "haunt" would not have affected average readers' perceptions of Lawrence. Indeed, the "gist" of Hearst's Articles was that (1) the WPD had stated that Lawrence had engaged in certain behaviors and (2) such behavior met the common definition of harassment. Therefore, when viewed in full context, the district court did not err in holding that Hearst's reporting on the police documents was substantially true and not defamatory.

Finally, as in *Altice*, Lawrence's emotional distress claim is meritless. An action for intentional infliction of emotional distress requires the plaintiff to establish "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *DeLaurentis v. City of New Haven*, 220 Conn. 225, 266-67 (1991). Conduct meets the "extreme and outrageous" standard when it goes "beyond all possible bounds of decency" to be "utterly intolerable in a civilized community." *Morrissey v. Yale Univ.*, 268 Conn. 426, 428 (2004) (quoting *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 443 (2003). Hearst's substantially true reporting does not meet this high standard. The district court properly granted summary judgment on the claim.

We have considered all of Lawrence's remaining arguments, which we conclude are without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

7