925 F.2d 1456
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Steven J. COREY, Plaintiff-Appellant,
v.
Steven H. SHOOK, CSX Transportation Group, Defendants-Appellees,
and
Alexander J. Ross, Defendant.
 No. 90-2632.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 5, 1990.
Decided Feb. 22, 1991.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., District Judge. (CA-88-1199-2)
 Michael Thane Clifford, Clifford & Mann, L.C., Charleston, W.V., for appellant.
 Leonard Knee, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, W.V., (Argued), for appellees; Brenda L. Gould, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, W.V., on brief.
 Before RUSSELL and WILKINS, Circuit Judges, and TILLEY, United States District Judge for the Middle District of North Carolina, sitting by designation.
 S.D.W.Va.
 AFFIRMED.
 PER CURIAM:
 
 
 1
 The appellant, Steven J. Corey, contests the district court's decision to grant summary judgment to the appellees, Stephen H. Shook and CSX Transportation Group. Our review of the record reveals that the district court correctly granted the motion and we, therefore, affirm.
 
 
 2
 The following facts are undisputed. In April 1988, appellant Steven J. Corey was Vice President in charge of legal affairs, finance, and business development of C & H Taxi Co. (C & H), which does business in Charleston, West Virginia. Appellee Stephen H. Shook, a Florida resident, is an in-house attorney for appellee CSX Transportation Group (CSX). He is responsible for supervising efforts of locally-retained counsel in CSX litigation. CSX uses taxis to transport train crews to their work locations.
 
 
 3
 On April 7, 1988 Corey, as counsel for C & H, wrote to four CSX officials and asserted that a competitor, Gary's Taxi (Gary's), violated state and federal laws by using employees rather than independent contractors as cab drivers. A copy of an amended complaint which C & H had filed against Gary's was attached. Corey asked CSX to investigate the facts and to cease using Gary's as long as it did not comply with the law. The letter concluded with a request that CSX take "appropriate action" within ten business days and said that if CSX continued to "support this blatant disregard of the law," C & H would bring suit.
 
 
 4
 The letter was referred to Shook in Jacksonville, Florida. He investigated its allegations and learned that CSX used Gary's more often than C & H, and that Gary's rates were lower than C & H rates. On April 28-29, 1988, Corey and Shook attempted by telephone to resolve their differences about whether CSX would continue doing business with Gary's Taxi. Corey again threatened to file suit and may have said that he already had done so.
 
 
 5
 Following those conversations, on April 29, 1988, Shook responded to Corey's letter. His letter stated that because no court had held that Gary's was violating the law, CSX would continue to use the taxi service of its choice. The letter concluded: "In the event you persist in this threat to sue the Company, please be advised that we will not only defend but counterclaim on any grounds that are legally permissible. It might be added your veiled threat to send some of your wrestling friends to cause me bodily harm was not at all appreciated." Corey alleges this last sentence is libelous.
 
 
 6
 Copies of the letter went to the following people: an investigator for the West Virginia Public Service Commission, which regulates taxi companies; an Assistant Attorney General for West Virginia in the antitrust division; CSX officers and employees; lawyers representing Gary's Taxi in three corollary cases at the time; and attorneys representing C & H in the same three corollary cases. The latter attorneys actually represented C & H in the lawsuit eventually filed by it against CSX and Gary's Taxi. That suit alleged that CSX aided Gary's in the unfair competitive practice of operating in violation of federal and state laws.
 
 
 7
 The trial court held that publication of the letter to the Public Service Commission and the Attorney General was absolutely privileged because it was a petition to redress grievances, an inviolate right under the West Virginia Constitution, article III, section 16. In Webb v. Fury, 167 W.Va. 434, 282 S.E.2d 28 (1981), the West Virginia Supreme Court of Appeals held that the right to petition "is a clear constitutional right and the exercise of that right does not give rise to a cause of action for damages." Id. at 38-39. The one exception recognized by that court is not applicable to this case. See id. at 39.
 
 
 8
 The Public Service Commission has responsibility for regulating all public utilities in West Virginia, including taxi services. W.Va.Code Sec. 24-2-1 (Supp.1989). It has authority to investigate all "methods and practices" of taxi services and to "require them to conform to the laws" of the State. Id., Sec. 24-2-2 (1986). The Public Service Commission treated defendants' letter as an informal complaint concerning a regulated utility and began an investigation of Corey's tactics on behalf of C & H. Similarly, the Attorney General's Office has the duty to investigate suspected antitrust violations, including attempts to establish a monopoly for the purpose of excluding competition. Id., 47-18-6 (1986). The Attorney General is authorized to bring suit to prevent or restrain antitrust violations. Id., Sec. 47-18-8 (1986). The Attorney General treated defendants' letter as notification that C & H might be involved in unlawful anticompetitive activities and as a request for assistance or intervention. Although its reasoning was criticized in In re IBP Confidential Business Documents Litigation, 755 F.2d 1300, 1311-14 (8th Cir.1985), Webb is the law in West Virginia. The district court correctly applied that law to the facts of this case and we, therefore, affirm this portion of the district court opinion.
 
 
 9
 The district court further held that the communication to the other recipients was absolutely privileged as preliminary to a proposed judicial proceeding. West Virginia has not addressed the question of absolute privilege as it applies to defamatory communications by a lawyer before the institution of judicial proceedings. At common law, such communications were not absolutely privileged. Another view is that the public policy favoring full and vigorous judicial proceedings applies equally to communications in anticipation of a suit. Thus, under the Restatement (Second) of Torts, an attorney is absolutely privileged to publish defamatory matter in communications preliminary to a proposed judicial proceeding wherein he will participate as counsel, if it has some relation to the proceeding. Restatement (Second) of Torts Sec. 586 (1976). This broader approach is based upon a public policy of giving attorneys the "utmost freedom in their efforts to secure justice for their clients." Id., comment a. About half the states have adopted this view. In another defamation case of first impression, the State Supreme Court of Appeals found the Restatement to be persuasive authority. See, e.g., Havalunch, Inc. v. Mazza, --- W.Va. ----, 294 S.E.2d 70, 75 (1981). We agree with the district court that West Virginia probably would follow the Restatement approach.
 
 
 10
 Under that scheme, "preliminary to a judicial proceeding" means at a stage where the commencement of a suit is seriously contemplated in good faith. Restatement Sec. 586, comment e. The attorney publishing the defamatory matter must participate as counsel in the proceedings. Both Corey and Shook participated in the subsequent litigation as supervising attorneys.
 
 
 11
 Next, the defamatory statement must have some relationship to the proposed litigation, although it need not be strictly relevant. Id., comment c. Matters "preliminary to a judicial proceeding" include settlement negotiations to avoid litigation and initial posturing by the parties. See, e.g., Chard v. Galton, 277 Or. 109, 559 P.2d 1280, 1282-83 (1977) (courts are liberal in applying Restatement; the privilege embraces any remark sufficiently relevant to settlement). The defamatory statement communicated CSX's resolve not to be bullied by Corey's alleged tactics. In an attempt to dissuade Corey from bringing suit, it was logical and pertinent to forcefully state that CSX would not back down.
 
 
 12
 Finally, a judicial gloss has been added to the Restatement: the communication is absolutely privileged only when its publication is limited to those with a substantial interest in the outcome of the litigation. The district court correctly held that each of these recipients had a substantial interest in the proceeding's outcome; most of them actually played a role in the eventual litigation.
 
 
 13
 AFFIRMED.